Commercial Bank of Cincinnati *vs.* H. P. Bowman.

In Special Term—January 1855.

SPENCER, J. presiding.

### THE COMMERCIAL BANK OF CINCINNATI
*vs.*
### HENRY P. BOWMAN, TREASURER OF HAMILTON COUNTY.

Section 60 of the Act of the General Assembly of Ohio, passed 24th of February 1845, entitled "An Act to incorporate the State Bank of Ohio, and other banking Companies," providing for a specific mode of taxing banks organized under that act, created a *contract* between the State and each of such companies, limiting the State's power of taxing such banks to the mode prescribed in said act. And the subsequent Act of 1851, prescribing a different and more burthensome mode of taxation, so far as it affects such companies, is in violation of said contract, and consequently void within the 10th Section of the first Article of the Constitution of the United States, which provides that "no State shall pass any law impairing the obligations of contracts."

Section 4 of the Act of General Assembly, passed March 23d, 1850, providing that banks whose charters prescribed any particular mode of taxation, &c., might by a vote of the stockholders, consent to the mode of taxation prescribed by this act, and by filing the evidence of such consent, &c., be taxed as it provided, is binding as a *contract* upon the State as to any bank accepting the provisions of said 4th Section; and the Act of 1851, above alluded to, is as to such cases void; or if the time should be considered as limited at the State's pleasure, then the bank, upon the repeal of said act of 1850, would be restored to its old method of taxation under its charter.

Courts will not interfere to prevent injury by injunction, unless the *title* of the plaintiff is *clear;* unless the menaced evil is *impending* and immediate, not lying in the mere fancy of the plaintiff; unless the harm will be *great,* or the loss irreparable, and such as cannot be recompensed in damages, by an action at law; or when the remedy by action is exceedingly *doubtful* or *difficult;* or inadequate to correct the evil.

*Semble,* that if the *plaintiff* has the legal right to repel the threatened trespass by *force,* and it is *practicable* so to do, an injunction would on that ground be refused.

This is a petition filed by the complainants, for the purpose of obtaining an injunction restraining the defendant from collecting a tax, alleged to be illegally assessed, against the complainants, for general purposes of government.

The bill alleges, that the complainants are a banking company, incorporated by an act of the General Assembly

of Ohio, entitled "An Act to incorporate the State Bank of Ohio, and other banking companies," passed the 24th day of February 1845, with a capital of $50,000, and doing business in the city of Cincinnati; having valuable franchises.    That by the 60th section of said act, it was declared, that "Each banking company, organized under said act, &c., should semi-annually, on the days designated for declaring dividends, set off to the *State* six per centum on the profits, deducting therefrom the expenses and ascertained losses of the company for the six months next preceding; which amount or sum, so set off, shall be in lieu of the taxes to which such company, or the *stockholders* thereof, on account of stock owned therein, would be subject; and the cashier shall, within ten days thereafter, inform the Auditor of State of the amount so set off, and shall pay the same to the Treasurer of State, on the order of said Auditor."    That afterwards, by another Act of Assembly, passed on the 23d day of March 1850, entitled "An act to provide for taxing banks and banking companies," it was provided:

"Sec. I. That the cashier or president of every banking institution in the State, whose charter does not prescribe any particular mode of taxation for the same, and every banking institution hereafter established in the State, shall annually, within ten days after the 15th day of November, make out under oath, and transmit by *mail,* or otherwise, to the Auditor of State, a statement showing the amount of the *capital stock* of said bank actually paid in and existing undiminished by losses ; and the amount of surplus or contingent fund then on hand, deducting however from such surplus or contingent fund the amount of money paid for real estate belonging to said bank, and

upon which it pays taxes in any other manner, than that which is herein after provided.

"SEC. II. The Auditor of State shall annually, as soon as he receives such statement, ascertain the total per centum of taxation assessed for all purposes, on money at interest, at the place where such bank is located; and shall immediately thereafter assess upon such capital stock and contingent fund, a per centum of tax equal to that so ascertained.

"SEC. III. That so soon as the amount of such tax is ascertained, the Auditor shall inform such bank; and said bank shall pay the same to the Treasurer of State, upon the order of the Auditor, and shall have a lien upon the stock of each of its stockholders, for the re-imbursement of his or her share of the tax so paid.

"SEC. IV. That if any existing bank, the charter of which does prescribe any particular mode of taxation for the same, shall by a vote of the stockholders, owning a majority of its stock, consent to the provisions of this act, and file their evidence of such consent with the Auditor of State, such bank shall thereafter, for the purpose of taxation, be subject to the provisions of this act, and shall be exempt from the payment of any other tax, imposed by its charter.

SEC. V. Imposes heavy penalties against the bank, for neglecting to furnish to the Auditor, the statement required by the first section of the act.

The petition further avers, that the plaintiffs on the — day of October 1850, by an unanimous vote of the stockholders, accepted of the proposition contained in the 4th section of said act, and duly delivered a statement of such assent in writing to the Auditor of State, who received the

same, and that thereafter, and from thenceforth, the plaintiff has furnished, from year to year, to the Auditor of State, the statements required by said first section, and has offered and ever has been ready and willing to pay to the Treasurer of State the taxes assessed by said Auditor.

That in the month of November 1852 their capital stock and contingent fund was $96,746, a statement of which was duly transmitted to the Auditor of State on the 8th day of said November, who failed to assess the tax thereon; that had such assessment been made as required by said act, the amount thereupon to be paid to the Treasurer of State, would have been $1596.30, which sum the plaintiff offered to pay to the Treasurer of State, and also to the Treasurer of Hamilton County, both of whom refused to receive the same. But on the contrary, the Treasurer of the county demanded a tax for that year of $6,938, which was illegally assessed against the plaintiff, under the provisions of an act of the General Assembly of Ohio, passed April 13th, 1852, and threatened, unless the plaintiffs would pay the same, to break open the plaintiffs' vaults, and distrain their property and effects, and enforce payment thereof; and would have so done, had he not been restrained by an injunction, issued from the Court of Common Pleas of said county.

That afterwards, in the month of November 1853, similar proceedings took place, the just tax under said law being about $1900.74, but the sum demanded by the Treasurer being $15,837.98, to collect which a like distress was threatened, which was in like manner enjoined.

That afterwards, in the month of November 1854, the plaintiff transmitted another statement to the Auditor of State, setting forth truly the amount of their capital stock

and contingent fund at $ 96,853.39, for the purpose of having the same assessed agreeably to said act of 1850, at the rate for which moneys at interest in the city of Cincinnati, (the place where said bank was doing business,) were assessed and taxed, being $16\frac{3}{4}$ mills upon each dollar thereof; which statement was duly received by the Auditor, but he refused to make the assessment thereon. Nevertheless the plaintiff tendered the sum of $1622.30, being at the rate of assessment last aforesaid, to the Treasurer of the State, who also declined to accept the same in lieu of the other taxes, assessed against the plaintiffs, as hereinafter mentioned; and the plaintiffs afterwards tendered the same sum to the defendant, Henry Bowman, Treasurer of Hamilton county, in payment in lieu of such other taxes, who also refused and still refuses to receive the same; but on the contrary demanded from the plaintiff the sum of $8180.39 tax, besides penalty, making in all $8500.89, as the tax for the year 1854, of which an exhibit is furnished; and on the first day of January 1855 made a formal demand in writing for payment thereof, and threatens, unless payment thereof is made within five days, (now past,) that he will proceed by force to break open the vaults of the plaintiffs' banking house, and "seize, distrain, and sequestrate their moneys and property for the satisfaction thereof." That said last mentioned assessment has been made, upon the *grand duplicate* of taxes, for said county of Hamilton, for the year 1854, in pursuance of the 19th, 20th, and 40th sections of the Act of the General Assembly, passed on the 13th day of April 1852, entitled " An act for the assessment and taxation of all property in this State, and for the levying taxes thereon, according to its true value in

money ; " which said sections are set forth at large in the bill; and provide for a wholly different mode of assessment and taxation, from that provided for in the 60th section of said first named act of 1845, under which plaintiffs became chartered ; and also wholly different from that provided for in said second named act of 1850, and substituted for that of said first named act, and by far (to an amount fourfold) more burthensome than either of said acts; the same being assessed without the consent of plaintiffs, and, as is claimed, in violation of their rights under the contract, in said first two named acts contained, whereby they became and were exempt from any such taxation as is prescribed in said last named act.

Plaintiffs further aver, that defendant is about to proceed to enter the banking house of the plaintiffs, and seize and take therefrom, by force if resisted, and by breaking into the vaults of plaintiffs, (if necessary,) a sufficient amount of moneys, bills of exchange, promissory notes, and other property of plaintiffs, to satisfy said illegal tax and penalty, with costs, &c.; under the provisions of another act of the General Assembly, passed on the 14th day of March 1853, entitled " An act to enforce the collection of taxes, due from Banks, &c., and to protect County Treasurers, &c., in the collection of the public revenue, " &c.; and will proceed so to do, and to *sell* said property, &c., unless restrained by due process of law.

The petition further avers, that the tax now assessed against plaintiffs, as last aforesaid, is a continuation of the same illegal exactions, to which they have been subjected in the two preceding years ; and that unless they can have relief therefor, they will be obliged to wind up their affairs, and surrender their franchises. That the collection

of said tax will greatly injure the value of their capital, and produce irreparable injury to their business. That the plaintiffs have no other adequate relief, than by injunction; and that if the defendant be permitted to proceed, the money, securities, and other property of the plaintiffs will be wholly lost to them, and must be sold at a *ruinous sacrifice*, whereby a large amount will be required to pay. That it was doubtful, whether plaintiffs can have any remedy other than that as aforesaid, and that any damages, which plaintiffs might recover, will be *wholly inadequate in law*, to make good the injury; and that they *believe* the defendant would be *unable* to respond.

Whereupon plaintiffs bring into court the amount which they admit to be properly chargeable against them, as aforesaid, being $1622.30, and ask that the defendant may be restrained, by injunction, from proceeding further in the execution of said tax, so illegally assessed against them, until the final hearing of the case; and that upon final hearing, said injunction be made *perpetual*.

The petition is sworn to in the usual form.

SPENCER, J.

The first question presented for consideration in the foregoing case is, whether the taxes, sought to be collected by the defendant, have been assessed against the plaintiffs, under a *valid law;* or whether they have been assessed wholly without *warrant of law.*

If assessed under a *valid* law, then the treasurer will be justified in enforcing their collection, even though he adopt the extreme course, which it is alleged he threatens to take. For that course is fairly warranted by the provisions of the act of March 1853, set forth in the petition.

If, on the other hand, they have been assessed, *wholly without warrant of law*, then the Treasurer will be a *trespasser*, should he commit the act threatened, and will be liable accordingly.

It is conceded on all hands, that the taxes in the present case have been regularly assessed under the act for the assessment and taxation of property, passed April 13th, 1852, which contains special provisions for the taxing of all property belonging to banks and banking companies, and that the mode of assessment therein adopted is wholly different from, and incompatible with the provisions of the 59th and 60th sections of the act, under which the plaintiffs became incorporated as a bank, as well, also, as with the provisions of the above recited "Act to provide for taxing banks and banking companies," passed March 23d 1850, and which the plaintiffs claim as to them was *a substitute* for said 59th and 60th sections; and that it imposes a burden vastly more *onerous* upon the plaintiffs, than that imposed by either of said last named acts; a burden to which the plaintiffs have not assented. It follows, that if by the said last named acts the plaintiffs may claim an exemption from taxation, in every other mode, than as prescribed thereby upon the foundation of *contract*, then, as to *them*, the mode adopted in the present case, was wholly unwarranted by law, and ought not to be carried out.

The recent, very thorough and elaborate examination, to which the 59th and 60th sections of the act referred to have been subjected by the Judges of the Supreme Court of this State, and by the Judges of the Supreme Court of the United States, renders it wholly unnecessary to do more than refer to the *results* of such examination,

and shape our own opinion accordingly. In the cases of Debolt *vs.* The Ohio Life Insurance and Trust Co. ; The Treasurer of Miami County *vs.* The Piqua Branch of the State Bank of Ohio; Mechanics' and Traders' Bank *vs.* Debolt; Bank of Toledo *vs.* Bond et al, decided by our Supreme Court, January Term 1853, 1 *O. S. R.* 563 *et seq.* ; and the subsequent case of the Exchange Bank of Columbus *vs.* Hines, decided at the January Term 1854, 2 *O. S. R.* appendix to preface, XII, it was held that the 60th section of the act of 1845 was *not a contract* between the State and the banks organized under said act, limiting thereby the *power* of the State to tax the banks thus organized; and that therefore the General Assembly had a right to repeal said section, and to tax the banks in any mode it might think proper.

This decision was based upon *two* grounds : 1st. That said section was merely part of a *general law*, adopted for the *public exigency* only, and was not intended as a pledge of the public faith, to establish and secure a private right. And 2d. That, if intended for this latter purpose, it was void, for want of power in the General Assembly to confer such a right without the ability to resume it at pleasure, inasmuch, as that would be a surrender *pro tanto* of the *sovereignty of the State.* The first two of these cases were taken up to the Supreme Court of the United States, upon *error*, in pursuance of the 25th Section of the Judiciary Act of the United States, which allows an appeal from the State Courts to those of the U. S., in cases involving the construction of the constitution of the United States, and will be found reported in the last vol. (16) of Howard's Rep., page —. It is needless to say, that the opinions of our own Supreme Court underwent a searching

review, and after a careful and anxious consideration, were overruled, by a majority of the Court, upon both grounds; the Court holding (six against three) that the 60th section of the act referred to, did create a contract, by which the power to tax the banks organized under the act, was limited to the mode therein prescribed; and that the law of 1851, prescribing a different and more burdensome mode of taxation, so far as it applied to such banks, was a violation of that contract, and therefore void within the 10th Section of the first Article of the Constitution of the United States, which provides, that "No State shall .pass any laws, impairing the obligation of contracts."

This decision of the only Court in the last resort, appointed to determine such questions, is one to which we are obliged to conform, and settles the right of the plaintiffs to an exemption from the taxation now sought to be imposed upon them; so far at least as that right depends on said 60th Section.

But by the 4th Section of the act above quoted, passed March 23d, 1850, it was provided, "that if any existing bank whose charter prescribed any particular mode of taxation for the same, should by a vote of its stockholders, consent to the provisions of said act, and file the evidence of such consent with the Auditor of State, such bank should thereafter, for the purpose of taxation, be subject to the provisions of said act, and be exempt from the payment of any other tax imposed by its charter."

The law containing this Section was adopted in consequence of the complaints made by a large portion of the community, that the banks did not bear their equal portion of the public burthens; and to quiet, in some sort these complaints by providing a nearer approximation to

equality, it was proposed to abandon the system of taxing banks upon *their dividends,* and substitute for it the plan of subjecting their capital stock and surplus profits, to the same rate of taxation that other moneys and credits were subjected to. The banks, themselves, felt in a strong degree the public pressure, and in many instances yielded to it, preferring to surrender a portion of their valuable rights, rather than encounter a growing sentiment of hostility; and doubtless believing that such surrender would secure them immunity for the future. Among others, the present plaintiffs accepted of the terms offered by this 4th Section—and accordingly, as averred in the petition, filed with the Auditor of State the evidence of their assent to abide by the provisions of said act—and the same was accepted by said Auditor, and the plaintiffs charged with taxes in pursuance thereof during the ensuing year and up to the passage of the act of 1851.

The provisions of this 4th Section are so plainly a *substitution,* for the mode of taxation provided (as to these plaintiffs) by the 60th Section above referred to, as to become part of the plaintiffs' *chartered rights*; as binding upon the State, and as *irrepealable,* as the 60th Section originally was; furnishing, for the future, during the existence of the bank, the only rule by which it could be taxed, without their own consent. If this construction could for a moment be doubted, and it were said that the act was repealable at pleasure, upon the ground that the exemption it created, was *indefinite as to time,* it would follow that the surrender by the plaintiffs of their right to be taxed under their *original* charter, would be only co-extensive with the right substituted for it, and when the latter failed, the original would be restored. So that

in any view of the matter, the law of 1851 ,under the decision of the highest tribunal known to us, must be held void, so far as it is sought to be rendered applicable to the plaintiffs, as being in violation of rights solemnly secured to them by contract; to the maintenance of which the faith of the State is pledged. It would therefore furnish no protection to the officer seeking to enforce its provisions. 2. The question next to be considered is, whether the evil threatened is one to be prevented by *injunction*; or whether the plaintiffs are bound to wait until the wrong has been committed, and seek redress, by compensation in damages. If the question were newly presented; or if in cases, *supposed* to be analogous to this, (and to which reference will be hereafter made,) the Supreme Court of Ohio had not denied the remedy by injunction, we should have felt but little difficulty in granting the relief asked. As those cases upon a cursory examination may seem to conflict with the decision to which we have arrived, it is proper to present our views more in detail, than we should otherwise have desired.

When the remedy at law is *difficult*, or doubtful, or accompanied with great *embarrassment*, if the *title* of the plaintiff be clear, a court of equity will interfere to *protect* it. In all such cases, the application is addressed to the *sound discretion* of the Court, and must be decided according to the peculiar circumstances of the case. 2 *Story Eq.*, § 863. It is true, that such discretion is not merely *arbitrary*, but is governed by fixed rules, which furnish a safe guidance for it. Subject however to these rules, the cases in which equity will interfere, to prevent wrong, are not limited either in number or character; but on the contrary, are daily multiplying, with the multiplied

33

changes and conditions in life. So that injunctions are much more liberally granted now than in former times, and are applied to a vastly greater variety of subjects. The rules, within which the application, (to be successful,) must fall, are, that the *title* of the plaintiffs is *clear*, not doubtful; that the evil with which it is menaced, is *immediate* and *impending*, not lying in the mere *fancy* of the party, however well founded; that the harm will be great, or the loss *irreparable*, and such as cannot be adequately *recompensed* in damages, by an action at law; or when the remedy, by action, is exceedingly *doubtful*, or difficult; or inadequate to correct the evil.

Apply these rules to the present case; the *title* of the plaintiffs, to an exemption from the burthen to which it is sought to subject them, is clear and complete. The laws, under which the defendant attempts to justify, are imperative in their terms. Under the first, (that of April 1851,) a tax has been imposed, by the proper authorities of the State, upon the plaintiffs, which the defendant, as one of its officers, believing it to be his duty to enforce, has required should be paid. The time appointed for payment, by said law, has elapsed. By another law, passed in March 1853, it is made the duty of the defendant, in his official capacity, upon default being made, to enter, if need be, *forcibly* into the banking house of the plaintiffs, and to seize by force such property, moneys, bills, notes, or otherwise, as he may deem necessary to satisfy said tax; and in a summary manner dispose of the same for that purpose. And the defendant has notified the plaintiffs, of his intention to proceed under the law. In addition to all this, the law proffers to *indemnify* the officer against the *consequences* of such action on his part. It

can hardly be supposed, under these circumstances, that the defendant will not *proceed forthwith,* to *execute* the law, and that the danger therefrom to the plaintiffs is imminent and *impending.* Then, as to the *extent* of the injury threatened; it involves property to a *very large* amount; in any aspect between 8 and $10,000, and probably between 15 and $20,000. For it is hardly to be supposed, that in the seizure of bills and notes, to satisfy a claim of 8 or $9000, the officer, to bring himself within safe bounds, would not feel himself required to seize effects, a great deal larger in *nominal value* and *amount.* But, finally :

Should the officer execute his purpose, would the injury fall within that class, which is termed in law great, or irreparable; or such as could not be adequately compensated in damages by an *action;* or where the ordinary remedy by action is inadequate to repair the evil ?

It is difficult to lay down any precise rule as to what mischiefs are deemed *irreparable;* but the term may be applied, not only in respect to the *nature* of the injury itself, as being one, where the damage cannot be fully compensated; but also to the *position of the parties,* where the evil, in contemplation of law, cannot well be remedied or prevented by any act of the parties themselves. As instances *of the former,* may be stated the invasion of franchises; the infringement of a patent or copyright; the destruction of an *heir loom;* or of ornamental trees upon an estate; because in such cases the injury cannot well be estimated; and is therefore not the subject of full compensation. As instances *of the latter,* may be stated waste committed by a tenant in possession of lands; by an administrator or other trustee, of the effects committed to

his charge; the improper transfer of a negotiable *note*, or *bill*; the threatened destruction of partnership property, by one of the firm.    In all these cases the injury might be the subject matter of compensation in damages, but it is insusceptible of remedy by the mere act of the party himself, and will be prevented by injunction.    On the other hand, a mere trespass to land, or goods, is not ordinarily the subject of an injunction; not only because it may be compensated by a jury in damages; but also because, in legal contemplation, the party has it in his own power to *prevent* the injury, without calling in the *aid* of injunction.    Every man in *possession* of property, is presumed to be able to resist of himself any encroachment upon it.    But when he is *not thus in possession,* and cannot obtain possession, or otherwise prevent the act, without himself being a *wrong doer*, then he may be aided by injunction.    Now, in the case of waste, the landlord could not enter upon the land, to prevent its commission, without himself being a *trespasser*.    On the other hand, when the person in possession of land is about to be *intruded upon*, he may repel force by force.    In the former case, therefore, the party about to be injured may have redress by injunction; in the latter not.

In view of all its accompanying circumstances, the injury threatened in the case now before the Court, may well be deemed irremediable; not only in regard to the difficulty, (if not utter impossibility) of restoring the plaintiffs after its commission, to the condition they occupied before; but also, in regard to the helplessness of their condition, in resisting the wrong, without the aid of an injunction.    The act contemplated by the defendant is clearly a trespass, but certainly not one of an ordinary

character, and fugitive in kind. It is one contemplated by a public officer, under *color of law*, and under a direct command thereof; a law which not only *authorizes him* to do the act, but calls to his aid, in its execution, the power of the county; a law which imposes a penalty on the defendant for refusing to perform the act, and renders it highly penal in the plaintiff to *resist* such performance, (Vide Sec. 10.) A law too which professes to indemnify the *officer*, and all acting under his command, against the consequences of the act. Can this possibly be assimilated to a case of ordinary trespass? The law under which the defendant would thus *justify*, is one which is *general* in its character, and in its ordinary application, is of binding obligation; it is only because of the special immunity of these plaintiffs, from the tax assessed, (an immunity not apparent in the law itself, nor in the law assessing the tax, but to be gathered from another law, containing a special exemption in their favor,) that the law has no binding force as to them. Can it be asked, or expected, that the plaintiffs under such circumstances, should be *able*, or even dare, to oppose the execution of the act, as a mere wanton trespass by the defendant?

It would take a *bold* man to come to the rescue, under threats of pains and penalties of law, bearing all the semblance of binding validity, in opposition to an officer, aided by the power of the county; whose express duty it is made by the law under penalties, to perform the act; and who is indemnified thereby against the consequences of its performance.

Whatever therefore may be the naked power of the plaintiffs in legal contemplation, to resist this trespass, it is power *shorn* of its *usual* strength; it is power which

no prudent man would attempt to exercise ; and no prudent man would aid in its exercise.   In such a case it seems to me the plaintiffs ought not to be required to resist force by force ; but ought to be permitted to come into Court, and standing upon their rights, ask to be protected in their enjoyment;—prevention by injunction seems to be their only efficient remedy.

But there is other and stronger ground here, for granting the injunction, growing out of the nature of the act, and the injury resulting therefrom.   The plaintiff is a banking corporation having valuable franchises, created by law, annexed to which, are certain exemptions from taxation, which add *materially* to the *value of the franchise.* The State of Ohio, under whom the grant is claimed, has passed a law, the effect of which, if carried out, is to violate the said grant, by imposing a tax, not only different in the mode of assessment, from that pointed out in the grant, but nearly *five fold* more burdensome; amounting annually to one sixth part of the entire capital of the bank, and to nearly, if not quite, *double* its *annual dividends.*

This tax, it has made it the duty of the defendant, as one of its officers, annually to enforce and collect, by what means and under what *penalties,* we have already seen. Now, it cannot be denied, that if the tax thus imposed can be *collected,* the value of the franchise is as much impaired thereby, as it would be by a law limiting the bank in the amount of its semi-annual dividends.   Nay, more, it is doubtful, under the averments of the petition, whether it would not so depreciate the value of the franchise, as to compel its entire surrender.   The burthen, (it must be observed,) is not an isolated, or transitory one, but a *con-*

*tinuing* and *permanent* one. It is one which has been sought to be enforced, by the predecessors in office of the defendant, under the same injunctions of law, for the two preceding years, now again sought to be enforced by the defendant himself. The whole tax during these three years, amounting to more than the annual dividends of the bank; and up to this time, to three fifths of its whole capital stock; a tax, which in two years more, at the same rate, would absorb the entire capital; whereas, if properly assessed, it would not have amounted during the whole five years to more than the one sixth part of the capital stock. If the State itself, instead of its officers, could be sued and rendered amenable to the process of its courts, it would hardly be doubted, that an *injunction* would be an appropriate remedy against her, for continued and continuing trespasses; amounting, as already seen, to a great *depreciation,* if not entire *destruction* of the plaintiff's franchise.

It would be of no moment to the enquiry, that the destruction of the franchise was not the *intention* of the *law;* it is enough that such is its actual and necessary operation.

But, although the defendant does not stand in the place of the State, and is not responsible *in law,* for the *acts* of his predecessors in office, and therefore not chargeable therewith, yet it is not to be overlooked, that the act now sought to be done by him, is a continuation or repetition, in behalf of the *same principal,* and under the same command, of the very same grievance; all tending in the aggregate to work out the *same result,* though the acts of either might, perhaps, be insufficient of themselves for that purpose.

In the case of Osburn *vs.* The United States Bank, 9 *Wheat.* 340, *Ch. J. Marshall,* in alluding to the connection of the State with its officers, under the same circumstances, says : " The law, if executed, would unquestionably effect its object, and would deprive the bank of its chartered privileges, so far as they were to be exercised in the State of Ohio," &c. " It was to be expected, that a person, continuing to hold an office, would perform a duty enjoined by his government, which was completely within his power. This duty was to be repeated until the bank should abandon the exercise of its chartered rights.

" To treat this as a *common casual trespass,* would be to disregard entirely its true character and substantial merits. The application to the Court was to interpose its writ of injunction, to protect the bank, not from the *casual trespass* of an *individual,* but from the total destruction of its franchise."

But how was the franchise to be destroyed or impaired by the mere act of an individual? The Court saw the evil not in the *individual* act, but in the *law* which *urged* the individual on; not *once ;* but from *year* to *year,* until the work of destruction should be complete. On page 342 they say : " The single act of levying the tax in the first instance is the cause of an action at law; but *that* affords a remedy only for the *single act ;* and is not equal to the remedy in chancery, which prevents its *repetition,* and protects the franchise."

They therefore wisely passed by the single act in the particular case, and viewed the results which must follow from its repetition in future times, as contemplated by the law. In a word, they looked through the *agent* to the principal; acting from necessity upon the *latter*

through the *former*. "If the State of Ohio, (say they,) could have been made a party defendant, it can scarcely be denied that this would be a strong case for an injunction," &c. "But if the person who is the real principal, the person who is the true source of the mischief, by whose power, and for whose advantage it is done, be himself above the law; be exempt from all judicial process; it would be subversive of the best established principles to say, that the laws could not afford the same remedies against the agent employed in doing the wrong, which they would afford against him, could his principal be joined in the suit."

It is true, in the case cited, that the Court, speaking of the effects of the law, therein complained of, say it would undoubtedly be to "deprive the bank of its chartered privileges, so far as they were to be exercised in Ohio;" not by the *single* trespass therein complained of, but by the *repetition* of trespasses, which the law contemplated. But the Court did not mean to intimate thereby, that an injunction would not be granted, unless the franchise were *totally destroyed*. On the contrary, they first laid down the law to be, that an injunction would be granted to prevent a *permanent* injury from being done to the party entitled to a franchise, or privilege; because the same cannot be estimated in damages; and then arguing from the *lesser* to the *greater* evil, go on to state, that if the lesser evil would be prevented, how much more the greater, *i. e.* the *total destruction* of the franchise.

This case, it seems to me, in its general principles, is directly applicable to the one now under consideration, and is conclusive of it. But, in one respect, it falls far short of the present case; for *there* the State was under

34

no special obligation to regard the chartered rights of the complainants; here she has created those rights herself, and has solemnly agreed to respect them. But the law, under which she has warranted the defendant to act in her behalf, and as her agent, is in derogation of those rights, and must seriously impair, if not wholly destroy them.

*That* was a case of trespass, accompanied with *great* damage and nothing more. *This* is the case of a like trespass upon a right, which the State is under obligation to protect.

There is another point of view, in which this case may be regarded, that ought not to be entirely overlooked. The business of plaintiffs is that of *banking;* in the conducting of which, one of its chief operations, (and from which much profit is derived,) is to receive the moneys of others on deposit, and their notes and bills for *collection.* By the terms of the law, under which the defendant assumes to act, it is made his duty to seize upon the moneys, bills, notes and other property found in the banking house of the plaintiffs, without stint or limit, until he has gotten enough in his own judgment, to satisfy the amount of the taxes assessed; and dispose of the same at auction to the highest bidder. In the practical progress of such an operation, it is scarcely possible he should avoid an injury to some one, whose only connexion with the bank consists in keeping his funds with them upon deposit, and using their services in collecting his *paper.* It would be difficult to imagine an act having a greater tendency to destroy the business of a bank, than the seizure of its effects, under such circumstances; its credit and character must inevitably be ruined by it; and I hazard nothing in

saying, that no bank, which allowed such seizure to take place from year to year, could possibly stand up against it. No action, or series of actions, could restore the credit thus destroyed, or reimburse in damages. *Smart money*, (which in cases of *ordinary trespass* is always allowed to meet the contingency of losses, which could not be otherwise compensated,) could not be recovered here. For the mandate of the law, though it would not wholly *justify* the officer, would shield him from the charge of *wanton* wrong, unless under cover of its protection, he committed *wilful* abuse. Neither is it any answer to say, that all this evil might be avoided, by a voluntary payment on the part of the plaintiffs, of the amount illegally assessed. In the first place, it is all assumption to say, they *have* the money wherewith the payment is to be made, without injuring other parties. But, secondly, it is no part of the policy of the law to require an individual to submit to an illegal exaction, rather than encounter a greater evil, and upon his refusal to do so, to deny him its aid. The same answer would have been equally sufficient in the case of Burnet *vs*. the City of Cincinnati, 3 *Ohio* 88. The complainant there could have avoided the sale of his property, by the payment of an insignificant tax; but the Court did not refuse to aid him on that account.

We have been referred by the defendant's counsel to three cases decided in our Supreme Court, in which the remedy by *injunction* has been refused, on the ground that the act of the officer was a simple trespass, and so remediable by a recovery in damages, by an action for such damages; which cases are supposed to be conclusive against the present application. But it seems to us they are all very clearly distinguishable from the case now before us.

The first, that of McCoy *vs*. The Corporation of Chillicothe, 3 *Ohio* 370, was the case of an application to restrain the collection by distress upon chattels, of an insignificant tax, that is, as to *amount*. The Court said there was no special circumstances in the case, to distinguish it from one of a *common trespass ;* except that the act sought to be enjoined, was about to be committed under the *color of law ;* that the injury was not irreparable, but could be remedied by *action*.

The second, that of the Mechanics' and Traders' Bank *vs*. Debolt, 1 *Ohio State Reports* 591, was an application for an injunction by one of the banks, chartered under the act of 1845, to restrain a tax under the law of 1851, imposed in violation of the 60th section of the former act, securing to the bank, (as in the present case,) immunity from such taxation. The Court held, that the tax was *properly assessed*, and therefore there was no cause of complaint.

But, in addition to this, the Court, resting upon the case of McCoy *vs*. Chillicothe, said it was a case of ordinary trespass, which could be remedied by action at law, and was therefore not the subject of injunction.

It will be observed that the Court in both these cases cite with approbation the decision of Osburn *vs*. The United States Bank, and distinguish between the cases, in this, that in those cases, it was a matter of *isolated* trespass, not calculated to work *irreparable mischief*, whereas in *that*, it was said, the trespass was to be committed under circumstances calculated to destroy the franchise of the Bank; but it is also to be observed, that when those two cases were decided, there was then no law in Ohio, as now, making it *penal* in the party to *resist* the

collection of the tax, thereby taking away from the party all its *protection*, should harm come to another, from his resistance.

The *third* case is that of the Exchange Bank of Columbus *vs.* Hines, 2 *Ohio State R.* App. to preface XII. We have as yet been furnished with *no report* of this case, and, therefore, cannot say how far it has gone, or what it has decided on the subject. It was a case however, like the *last*, in which the Court held that the tax was *rightfully* assessed. No injunction, therefore, could be granted. It is understood, however, that the Court also held, that an injunction would not be granted, because of the *insolvency* of the *Treasurer*, inasmuch, as the 13th Section of the law of March, 1853, provided indemnity to the Treasurer, and furnished him with the means of payment; this, however, it is supposed, like the others, was a case of *isolated* trespass, involving no special circumstances to distinguish it from ordinary trespasses.

But the case now before the Court, is wholly disembarrassed, by the decision of the Supreme Court of the United States, of any question, as to the right of the plaintiffs to be exempt from the tax now assessed. It is the case, not of an *isolated* or *single* trespass, but a *continuation* of such trespasses; under circumstances necessarily calculated to impair the franchise of the plaintiffs. Had our Supreme Court, in the two cases last cited, been *clear* in the *right* or *title* of the complainants to the exemption claimed, it is doubtful whether they might not have *hesitated* before they refused the injunction. At all events, it is believed, that they would not have refused in a case, when the injury was repeated and continued, as in the present instance.

But the question now presented was decided by the Circuit Court of the United States for the district of Ohio, at the last October Term, in the case of Worsley *vs.* Dodge; and the Commercial Bank of Cleveland, where an injunction was granted, under a statement of facts, very similar to that made in the present case, though not presenting perhaps as strong grounds for interference by injunction. The Court in granting the injunction, refer to the principle laid down upon that subject, in the case of the State of Pennsylvania *vs.* The Wheeling Bridge Co. 13 *How.* 567, viz : "there must be such an injury as from its nature is not susceptible of being adequately compensated by damages at law; or such as from its *continuance* or permanent mischief must occasion a constantly recurring grievance, which cannot otherwise be prevented than by an injunction;" and then add with reference to the case before them, "the character of the trespass complained of, and threatened, is not only an annual recurring grievance, but if continued, must be fatal to the Bank. The tax and the penalty for non-payment, together with the costs of collection, would impair the credit, and destroy the usefulness of any bank." This, in the opinion of the Court, was an injury not to be remedied by *action alone.*

Believing, as we do, that this decision is in consonance with sound principle, and is not in conflict with the decisions of our own Courts, we are disposed to adopt it as our guide in the present case; and shall therefore grant the injunction asked for.

Judges STORER and GHOLSON concurred in the above opinion.

KING, ANDERSON, & SAGE for plaintiffs.

PUGH & PENDLETON for defendants.